IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

|  |  |  |
|---|---|---|
| RICHARD TERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-cv-1133-TMP |
| | ) | |
| ANDREW SAUL, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER AFFIRMING THE COMMISSIONER'S DECISION

Before the court is plaintiff Richard Terry's appeal from a final decision denying his application for supplemental security income under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-34, filed on June 19, 2020. (ECF No. 1.) The parties have consented to the jurisdiction of the United States magistrate judge under 28 U.S.C. § 636(c). (ECF No. 15.) For the reasons below, the Commissioner's decision is AFFIRMED.

## I.   FINDINGS OF FACT

Plaintiff Richard Terry is a high school graduate who lives in Lexington, Tennessee. (R. at 36, 203-04.) Terry lives with a friend who provides him with shelter and support, although he buys his own food with food stamps. (R. at 204.) He most recently worked as a welder but was laid off in either 2007 or 2008 and has not worked since. (R. at 35-36.) Terry filed the instant application

for disability benefits on January 10, 2018.[1] (R. at 15.) His application alleges that he suffers from twelve medical conditions, including residual effects from a cerebrovascular accident, cerebellar ataxia, diplopia, reactive depression, anxiety, memory problems, long-term anticoagulant use, chronic obstructive pulmonary disease ("COPD"), neuropathy, swelling of the feet and the hands, being consistently out of breath, and an inability to pick things up. (R. at 220.) His application alleged that he became disabled on November 5, 2016, but his disability onset date was later amended to September 20, 2018. (R. at 34, 203.) After his claim was denied initially and on reconsideration, Terry requested a hearing before an ALJ. (R. at 115-17.) Accordingly, a video hearing was held on May 17, 2019. (R. at 30.) Terry and Nancy Hughes, a vocational expert, testified at the hearing. (R. at 31.)

According to testimony at the hearing, Terry's disability began on September 20, 2018. (R. at 34.) Prior to that date, Terry testified that he had experienced "a few episodes of blacking out and falling." (R. at 37-38.) On September 20, 2018, Pat – apparently Terry's landlord and roommate – discovered him in an

---

[1]Terry filed an earlier application for disability insurance benefits on March 23, 2015. (R. at 56.) His earlier application was denied after a hearing by an administrative law judge ("ALJ") on November 9, 2016. (R. at 65-66.) He did not appeal the ALJ's decision.

incapacitated state and called an ambulance. (R. at 38.) Initially, Terry refused to go to the hospital, but he testified that he ultimately agreed to get in the ambulance. (R. at 38.) The next thing he remembered was waking up at Jackson General Hospital. (R. at 38.) According to Terry, he suffered a cardiac arrest, respiratory failure, and renal failure. (R. at 38.) He was placed on a ventilator and needed to be resuscitated. (R. at 38.) At one point, he was considered medically dead. (R. at 38-39.)

Terry testified that he was discharged from the hospital the following month and was prescribed a cane. (R. at 39.) He was readmitted to the hospital on October 16, 2019, with bilateral pulmonary embolism ("PE") and deep vein thrombosis ("DVT"). (R. at 650.) At that point, an inferior vena cava filter ("IVC filter") was inserted into his lungs to treat his PE and DVT. (R. at 650.) Terry's discharge report describes his condition as "improved and quite stable hemodynamically" and noted that Terry "verbalized understanding that despite hd being stable there is still risk of progression and still agreed with conservative management." (R. at 662.) Terry's IVC filter was removed later that month. (R. at 41.)

Terry testified that he relies on a cane to get around, although he can go short distances in his home without it because there are things he can hold onto for support. (R. at 39.) He also testified that he has been more forgetful since his cardiac arrest and that his vision has gotten noticeably worse. (R. at 39-40.) As

a result, his doctor recommended that he stop driving. (R. at 40.)
He also suffers from bad headaches and testified that one side of
his face (which has paralysis stemming from a stroke he suffered
in 2012) has "weird nervous feelings" that "feel[] like someone's
piercing [his] ear occasionally." (R. at 40-41.) He testified that
his headaches are more manageable when he is not wearing his
glasses but that he cannot see at all without them. (R. at 41.)
Although he has never been formally diagnosed, Terry testified
that his doctor informed him that he has arthritis in his back.
(R. at 42.) He testified that his hands are in constant pain and
that, because of his back, he cannot pick up anything heavy and
can hardly walk.[2] (R. at 42.) He is prescribed Gabapentin and
Hydrocodone to manage the pain. (R. at 42, 44.) On the average
day, Terry testified that his pain ranges between a five and seven
out of ten. (R. at 45.) He testified that he can only stand for
five or ten minutes before needing to sit down and that he can
only sit for thirty minutes before needing to move around. (R. at
42-43.) Additionally, he testified that he suffers from a blood
disorder that makes him prone to blood clots. (R. at 47.) As a
result, he spends most of his day in a recliner with his legs
elevated. (R. at 47.) In addition to his physical ailments, Terry

---

[2]Terry estimated that the most he could pick up would be ten or
twelve pounds. (R. at 44.) His estimate was based on the fact that
he occasionally makes large batches of soup. (R. at 44.)

testified that he suffers from depression and anxiety. (R. at 45.) He is prescribed medication for both. (R. at 45.) According to Terry, he feels like he cannot breathe when he goes outside and is surrounded by people. (R. at 45.) Also, he testified he cannot concentrate or focus on tasks and he quickly forgets information relayed to him. (R. at 46.)

Hughes testified that, based on the Dictionary of Occupational Titles ("DOT"), Terry's past work as a welder can be classified as medium skilled. (R. at 49.) The ALJ posed two hypothetical individuals to the vocational expert. First, the ALJ asked Hughes about the employment opportunities for

> an individual the same age, education and work experience as that of Mr. Terry. I ask you to further consider the individual is limited to perform work that at the sedentary exertional level with additional restrictions as follows. They[] require the ability to stand and walk with an assistance, with the assistance of an ambulatory device, would never be able to climb – and that's going to be a cane, not a, not a walker.
>
> . . .
>
> Never climb ladders, ropes and scaffolding. Occasionally perform all other posturals. Individual should avoid concentrated exposure to temperature change, vibration, pulmonary irritants and all exposure to hazards in the workplace, such as dangerous moving machinery and unprotected heights. Can that hypothetical individual perform past work?

(R. at 49-50.) Hughes testified that such an individual could not work as a welder, but that he or she could work in numerous unskilled, sedentary occupations, such as "touch-up screener,"

"document preparer," or "telephone quotation clerk." (R. at 50.) According to Hughes, about 100,000 jobs exist in the national economy that would be suitable for the ALJ's hypothetical individual. (R. at 50-51.) The ALJ next asked Hughes

> [t]o consider that the individual would be limited to occasionally and frequently lifting less than ten pounds, would be sedentary except as noted, would not be able to stand and walk for more than an hour in a two-hour day, would never be able to climb, balance, kneel, crouch, crawl or stoop, would be able to occasionally reach all directions and handle with both upper extremities and should avoid concentrated exposure to temperature extremes, dust, vibration, humidity, pulmonary irritants and all exposure to hazards in the work place as previously defined.

(R. at 51.) According to Hughes, that person could not work any jobs in the national economy. (R. at 51.) Counsel for Terry did not ask Hughes any follow up questions on cross-examination.

On June 14, 2019, the ALJ issued a written decision denying Terry's request for benefits. (R. at 24.) The ALJ followed the Five Step process to reach his decision. At Step One, the ALJ observed that Terry has not engaged in any substantial gainful activity since January 10, 2018. (R. at 17.) At Step Two, the ALJ found that Terry suffers from several severe impairments, including peripheral vascular disease, COPD, peripheral neuropathy, dysfunction of major joints, fracture of the lower extremity, obesity, and a history of vascular insult to the brain. (R. at 17.) In reaching this finding, the ALJ considered that Terry suffers from depressive and anxiety disorders but observed that,

based on four broad categories of mental functioning, these disorders result in no more than "mild" limitations and are thus non-severe. (R. at 18.)

At Step Three, the ALJ opined that Terry's impairments (or any combination thereof) did not meet or medically equal the severity of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 18.) At this step, the ALJ considered how Terry's obesity might impact his ability to work and perform activities of daily living. (R. at 18-19.) The ALJ also found that Terry's COPD does not constitute chronic pulmonary insufficiency (Listing 3.02), that he does not suffer from peripheral arterial disease (Listing 4.12), that he did not suffer a central nervous system vascular accident in conjunction with any of the necessary conditions to be considered disabling (Listing 11.04), that his symptoms do not satisfy the conditions for peripheral neuropathy (Listing 11.14), that he can still ambulate and perform fine and gross movements effectively and thus does not suffer from major dysfunction of a joint (Listing 1.02), and that there is no evidence suggesting that he has a fractured femur, tibia, pelvis, or tarsal bones (Listing 1.06). (R. at 19.)

Next, the ALJ concluded that Terry had the residual functional capacity ("RFC") to perform sedentary work as it is defined by 20 CFR § 416.967(a) with the following modifications: he can "stand/walk with assistance of ambulatory device; never climb

ladders, ropes, or scaffolds; occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; avoid concentrated exposure to temperature extremes, vibration, pulmonary irritants, and avoid all exposure to hazards." (R. at 19-20.) The ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." (R. at 20.) The ALJ also noted that he considered all medical opinions and prior administrative medical findings in conducting his analysis. (R. at 20.) Based on Terry's RFC, the ALJ determined that Terry could not return to his previous work as a welder. (R. at 22.) However, based on his age, high school education, and communication skills, the ALJ found that Terry can perform a significant number of jobs that exist in the national economy, such as "touch up screener," "document preparer," and "telephone quotation clerk." (R. at 23.) As a result, the ALJ found that Terry was not eligible for disability insurance benefits. (R. at 24.)

On April 30, 2020, the Appeals Council denied Terry's request to review the ALJ's decision, making the decision final. (R. at 1.) Terry filed the instant action on June 19, 2020, seeking reversal of the ALJ's decision. (ECF No. 1.) Terry raised a number of issues in his brief, including (1) that the ALJ erred in weighing the medical opinion evidence and (2) that the ALJ did not consider all of Terry's impairments in determining his RFC and

thus the determination was erroneous. (ECF No. 19.) The Commissioner filed a response brief on May 10, 2021. (ECF No. 22.) Subsequently, Terry filed a reply brief on May 24, 2021. (ECF No. 23.)

## II.  CONCLUSIONS OF LAW

### A.  Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which he or she was a party. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision and whether the Commissioner used the proper legal criteria in making the decision. Id.; Cardew v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is more than a scintilla of evidence but less than a preponderance, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record as a whole and "must 'take into account whatever in the record fairly detracts from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support a decision the other way." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (quoting Smith v. Sec'y of Health & Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Rather, the Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the testimony. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir. 1990).

## B.   The Five-Step Analysis

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1). Additionally, section 423(d)(2) of the Act states that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Under the Act, the claimant bears the ultimate burden of establishing an entitlement to benefits. Oliver v. Comm'r of Soc. Sec., 415 F. App'x 681, 682 (6th Cir. 2011). The initial burden is on the claimant to prove she has a disability as defined by the Act. Siebert v. Comm'r of Soc. Sec., 105 F. App'x 744, 746 (6th Cir. 2004) (citing Walters, 127 F.3d at 529); see also Born v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir. 1990). If the claimant is able to do so, the burden then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. Born, 923 F.2d at 1173; see also Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 559 (6th Cir. 2014).

Entitlement to Social Security benefits is determined by a five-step sequential analysis set forth in the Social Security

Regulations. See 20 C.F.R. §§ 404.1520 & 416.920. First, the claimant must not be engaged in substantial gainful activity. See 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, a finding must be made that the claimant suffers from a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(5)(ii). In the third step, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. See 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled. On the other hand, if the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the RFC to return to any past relevant work. See 20 C.F.R. §§ 404.1520(a)(4)(iv) & 404.1520(e). If the ALJ determines that the claimant can return to past relevant work, then a finding of not disabled must be entered. Id. But if the ALJ finds the claimant unable to perform past relevant work, then at the fifth step the ALJ must determine whether the claimant can perform other work existing in significant numbers in the national economy. See 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g)(1), 416.960(c)(1)-(2). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. 20 C.F.R. § 404.1520(a)(4).

## C.   Medical Opinion Evidence

Terry's first argument is that the ALJ erred in how he weighed and considered the opinions of several medical providers in the record. As a threshold matter, because Terry filed his application for disability benefits after March 27, 2017, the ALJ was required to adhere to 20 C.F.R. § 416.920c in how he considered and articulated medical opinions and prior administrative medical findings. See Jones v. Berryhill, 392 F. Supp. 3d 831, 839 (E.D. Tenn. 2019). Under 20 C.F.R. § 416.920c(a), an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." Instead, ALJs are directed to analyze the persuasiveness of medical opinions and prior administrative medical findings by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 416.920c(c)(1) to (5). The regulations provide that the supportability and consistency factors are the most important factors for an ALJ to consider. 20 C.F.R. § 416.920c(a). In articulating the persuasiveness of each medical source opinion, an ALJ must explain how he considered these two factors in his or her decision; however there is no such requirement for the other listed factors. 20

C.F.R. §§ 416.920c(b)(1) to (2). Instead, the remaining factors are to be considered where "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported and consistent with the record but are not exactly the same." 20 C.F.R. § 416.920c(b)(3) (internal subsection references omitted). In practice, "the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion." Lester v. Saul, No. 5:20CV1364, 2020 WL 8093313, at *10 (N.D. Ohio, Dec. 11, 2020), report and recommendation adopted, No. 5:20CV1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021) (quoting Ryan L.F. v. Comm'r of Soc. Sec., No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019)); see also Jones, 392 F. Supp. 3d at 839 (holding that claims filed after March 27, 2017, are not subject to the treating physician rule or other requirements based on superseded regulations) (citing Blakley v. Comm's of Soc. Sec., 581 F.3d 399, 406 (6th Cir. 2009)). Regardless, "the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" Id. (quoting Ryan L.F., 2019 WL 119287, at *4). As such, despite the new standards being more relaxed than their predecessors, an ALJ must still "provide a coherent explanation of his reasoning" in analyzing each medical opinion. Id. at *14.

    1.   Dr. Joseph Montgomery, M.D.

Terry argues that the ALJ erred by giving only partial weight to the opinion of Dr. Joseph Montgomery, M.D. Terry saw Dr. Montgomery for a disability assessment on April 11, 2019. (R. at 740.) Dr. Montgomery opined on both Terry's mental and physical health. In terms of mental health limitations, Dr. Montgomery opined that Terry has moderate to extreme limitations in his ability to understand and carry out instructions, in large part due to the stroke he suffered in 2012 and his history of alcohol abuse. (R. at 744.) Dr. Montgomery also opined that Terry has marked limitations in his ability to interact with others and respond to changes in a routine work setting because of his reported anxiety and depression. (R. at 745.) In terms of physical limitations, Dr. Montgomery opined that Terry can occasionally and frequently lift less than ten pounds, stand for no longer than two hours in an eight-hour workday, and that his ability to push and pull is affected by his impairments. (R. at 747-48.) Dr. Montgomery explained that his opinions were based on

> [Terry's] stroke in 2012 and his residual difficulty with walking. It requires a cane in his right hand to prevent falls. MRI September 2018 showed avascular necrosis of both hips. This is potentially crippling without surgery. It's now a clotting abnormality which caused his stroke so orthopedic surgery would be dangerous.

(R. at 748.) Additionally, because of arthritis in his hands, a rotator cuff injury, his COPD, and blood clots in his lungs that make him short of breath after any effort, Dr. Montgomery opined

- 15 -

that Terry could never balance, climb, kneel, crouch, crawl, or stomp. (R. at 748.) He opined that Terry is limited to only occasionally reaching in all directions and in handling objects, but he is not limited in fingering or feeling. (R. at 749.) Dr. Montgomery also opined that Terry was limited in experiencing temperature extremes, dust, vibration, humidity/wetness, hazards, and fumes/odors/chemicals/gases because of pain from his arthritis and his shortness of breath from his COPD and blood clots in his lungs. (R. at 750.)

Substantial evidence supports the ALJ's finding that Dr. Montgomery's opinion was only partially persuasive. In his opinion, the ALJ expressly found that Dr. Montgomery's opinion contained inconsistencies (both internally and with the record) and was not wholly supported by the record. See Pogany v. Berryhill, No. 4:18-CV-04103-VLD, 2019 WL 2870135, at *27 n.7 (D.S.D. July 3, 2019) ("Supportability and consistency will be the most important factors, and usually the only factors the ALJ is required to articulate."). The ALJ specifically noted in his opinion that Dr. Montgomery's own findings "showed no evidence of wheezing or rhonchi, no back tenderness and a negative [straight leg raise] test" and that imaging reports from 2019 did not show any evidence of DVT. (R. at 22, 743, 767-68.); see Rice v. Saul, No. 20-10500, 2021 WL 1822309, at *7 (E.D. Mich. Feb. 23, 2021), report and recommendation adopted by, Rice v. Comm'r of Soc. Sec.,

No. 20-10500, 2021 WL 1248292 (E.D. Mich. Apr. 5, 2021) (finding that an ALJ did not err in weighing physician opinions under § 404.1520c where the ALJ's persuasiveness findings were "prefaced by a thorough discussion of the treating, consultative, and non-examining records" and "[t]he ALJ cited the treating records showing a full range of motion in all joints, a normal gait, intact strength, and intact sensation in the upper and lower extremities"). Moreover, the ALJ reasoned that Terry's RFC restricted him to "simple work activities" that were consistent with someone of Terry's medical profile. (R. at 22.); see Smith v. Comm'r of Soc. Sec., No. 2:20-cv-2886, 2021 WL 1996562, at *6 (S.D. Ohio May 19, 2021) ("The ALJ explicitly stated that she found NP Boldon's opinion not completely supported by, or consistent with, the administrative record and then described the evidence that led her to that conclusion. . . . That is all the regulations require."). That the ALJ also considered how Dr. Montgomery was hired by counsel for Terry "and is always supportive of [Terry]'s position" is not reversible error. 20 C.F.R. § 416.920c(c)(5) (authorizing ALJs to consider any "other factors that tend to support or contradict a medical opinion or prior administrative medical finding"). As such, because substantial evidence supports the ALJ's finding that Dr. Montgomery's medical opinions were only partially persuasive, the court finds that the ALJ did not commit reversible error.

2.  Dr. Donita Keown, M.D.

Terry also argues that the ALJ committed reversible error by giving "significant weight" to Dr. Donita Keown's medical opinion. Terry was examined by Dr. Keown on April 18, 2018. (R. at 576.) Dr. Keown found (1) that Terry suffered from "[c]erebrovascular disease resulting in probable infarct to cerebellum based on residual symptomatology/complaint," (2) that he was in need of "[a]nticoagulation therapy, [and] strongly suggest[ed] alcohol cessation," (3) that his "[v]isual activity would likely improve with new prescription lens, mild esotopia, would benefit from prescription lens for refractive error," (4) that he suffered from "[c]hronic obstructive pulmonary disease of mild severity," and (5) that her physical exam "suggests early congestive heart failure." (R. at 578.) Dr. Keown also ordered an X-Ray of Terry's chest, which revealed that Terry had decreased lung volumes but that his lungs were clear and that his pulmonary vascularity was "normal." (R. at 575.) Based on her findings and observations, Dr. Keown opined that Terry "is capable [of sitting] six to eight hours, walk[ing] or stand[ing] two to three hours, occasional[ly] lifting of 1- to 12 pounds for items positioned at counter height" and that Terry "should avoid unprotected elevations, alcohol use, adapt to American Diabetic Association diet, [and] reduce [his] body mass index to 25." (R. at 578.)

In his opinion, the ALJ found that Dr. Keown's opinion was persuasive because it was "consistent with the totality of the evidence and supports the reduced range of sedentary work." (R. at 21.) The ALJ then identified portions of the record that were consistent with Dr. Keown's opinion, particularly how Terry had reduced his body mass index, that his straight leg raise test was negative, that most of his lung examinations were normal, and that a 2019 ultrasound showed no evidence of DVT. (R. at 21.) Although he only briefly analyzed the persuasiveness of Dr. Keown's opinions, earlier in his opinion the ALJ reviewed Dr. Keown's objective medical findings in greater detail when he walked through Terry's relevant medical history. (R. at 20-21.) In that section of his opinion, the ALJ noted that Dr. Keown's examination "showed decreased lung volumes," that Terry "uses inhalers for COPD," that Terry "measured 312 pounds and was 69.5 inches tall," that Terry "had full strength in the bilateral upper and lower extremities," that Terry "moved from a seated position to standing without assistance," and that Terry's "COPD was 'mild.'" (R. at 20-21 (citing R. at 575-78.)).

The court finds that the ALJ's consideration of Dr. Keown's opinion comports with applicable social security regulations. In accordance with the regulations, the ALJ considered that Dr. Keown's opinions were consistent with the totality of the evidence and cited to objective medical evidence that supported her

opinions. To be sure, Dr. Keown rendered her opinions before Terry was hospitalized in September and October 2019 and thus did not have the entire medical record before her. However, the ALJ also reasoned that Dr. Keown's findings were consistent with more recent medical evidence, in particular the January 2019 ultrasound that "showed no evidence of DVT" and the February 2019 examination showing that his lungs were "normal." (R. at 21.) Under the new regulations, an ALJ need only "articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" Bovenzi v. Saul, NO. 1:20CV0185, 2021 WL 1206466, at *3 (N.D. Ohio Mar. 31, 2021) (quoting Lester, 2020 WL 8093313, at *10). The ALJ did just that and "provide[d] a coherent explanation of his reasoning." Lester, 2020 WL 8093313, at *14. Consequently, the court finds that the ALJ's finding that Dr. Keown's opinion was persuasive is supported by substantial evidence.

**D. Other Severe Impairments**

Next, Terry avers that the ALJ erred in how he classified several of Terry's impairments, ultimately resulting in a flawed RFC determination. The ALJ advanced past Step Two in his disability determination analysis by finding that Terry suffered from several severe impairments, including peripheral vascular disease, COPD, peripheral neuropathy, dysfunction of major joints, fracture of the lower extremity, obesity, and a history of vascular insult to

the brain. According to Terry, the ALJ should have considered several additional impairments (his alleged cardiac arrest, DVT, acute PE, and bilateral avascular necrosis of the bilateral hips) as severe and that limitations from these conditions would render him unable to enter the workforce. The ALJ did not explicitly mention in his Step Two analysis any of the impairments that Terry argues in his brief are severe.

At Step Two of the ALJ's inquiry, the ALJ is asked to determine if the claimant suffers from any severe impairments, i.e. "an impairment or combination of impairments significantly limits the claimant's ability to do basic work activity." 20 C.F.R. § 416.920. The Sixth Circuit has described this as a *de minimis* hurdle, Rodgers v. Comm'r of Soc. Sec., 486 F.3d 234, 243 n.2 (6th Cir. 2007) (citing Higgs v. Bowen, 880 F.2d 860, 862 (6th Cir. 1988)), designed to "screen out totally groundless claims." Anthony v. Astrue, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting Farris v. Sec'y of Health & Human Servs., 773 F.2d 85, 89 (6th Cir. 1985)). Thus, once the ALJ finds that the claimant suffers from at least one severe impairment, it is not reversible error for an ALJ to decline to classify an additional impairment as severe, provided "the ALJ considers all of the individual's impairments" in later steps. Kirkland v. Comm'r of Soc. Sec., 528 F. App'x 425, 427 (6th Cir. 2013); see also Kestel v. Comm'r of Soc. Sec., 756 F. App'x 593, 597 (6th Cir. 2018) (holding that

once the ALJ determined one of the claimant's impairments was severe, it was "unnecessary" to decide whether there was any error in classifying a separate impairment as non-severe).

In the instant case, the ALJ found that Terry suffered from several severe impairments and proceeded to advance to the next steps in his disability determination analysis. Thus, the ALJ did not commit reversible error. See Hedges v. Comm'r of Soc. Sec., 725 F. App'x 394, 395 (6th Cir. 2018) (per curiam) (if an ALJ finds at least one impairment to be severe and goes on to consider all of the impairments in the remaining steps, "whether the ALJ characterized [claimant's] . . . impairments as severe or nonsevere at step two is 'legally irrelevant' and does not amount to error.") (quoting 20 C.F.R. § 404.1545(e) and Anthony, 266 F. App'x at 457); Overton v. Comm'r of Soc. Sec., No. 16-2444, 2018 WL 3458495, at *5 (W.D. Tenn. July 18, 2018) ("Because the ALJ is [subsequently] required to consider all of a claimant's impairments (severe and non-severe), '[t]he fact that some of [claimant's] impairments were not deemed to be severe at Step Two is therefore legally irrelevant.'") (quoting Anthony, 266 F. App'x at 457).

This conclusion, however, does not answer the question of whether the ALJ sufficiently considered all of Terry's impairments (both severe and not) in determining his RFC at Step Four. 20 C.F.R. § 416.945(e) (instructing ALJs to "consider the limiting effects of all [claimant's] impairment(s), even those that are not

severe, in determining [claimant's] residual functional capacity"); see SSR 96-8p, 1996 WL 374184 (July 2, 1996) ("In assessing [residual functional capacity], the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). A claimant's RFC is "the most she can do despite the combined effect of her credible limitations." McCurrie v. Saul, No. 19-1081-jay, 2020 WL 7866189, at *3 (W.D. Tenn. May 8, 2020) (citing 20 C.F.R. §§ 404.1545, 416.945). The Sixth Circuit has reasoned that an RFC is "meant to describe the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from — though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 240 (6th Cir. 2002).

That said, "some courts [have] found reversible error when the step four analysis was 'devoid of any explicit reference to [the non-severe] impairments' and the ALJ failed to 'address or include any limitations' from those impairments in the RFC determination." Booth v. Saul, No. 19-10824, 2020 WL 5522987, at *2 (E.D. Mich. Aug. 27, 2020) (quoting Stephens v. Astrue, No. 09-55-JBC, 2010 WL 1368891, at *2 (E.D. Ky. March 31, 2010)). However, this requirement simply requires that the ALJ make it clear that any potential limitations from both severe and non-severe impairments were considered in his or her analysis of the

claimant's RFC. See Emard v. Comm'r of Soc. Sec., 953 F.3d 844, 851 (6th Cir. 2020) ("[An] ALJ need not specifically discuss all nonsevere impairments in the residual-functional-capacity assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p."); Miller v. Comm'r of Soc. Sec., 524 F. App'x 191, 194 (6th Cir. 2013) (holding that "[t]o the extent that the ALJ erred by failing to find that Miller's cognitive and personality deficits constituted severe impairments, the error was harmless because the ALJ adequately took into account the effects of those deficits" when making his RFC assessment); Ferguson v. Berryhill, No. 18-cv-01152-TMP, 2019 WL 1569351, at *4 (W.D. Tenn. Apr. 11, 2019) (finding that it was not reversible error for an ALJ to not classify an impairment as severe where he considered the claimant's alleged impairments throughout his decision). As such, while "[t]he ALJ's specific determination of RFC must be supported by substantial evidence, . . . the claimant bears the burden of demonstrating the need for a more restrictive RFC." Rice, 2021 WL 1248292, at *3 (citing Jordan v. Comm'r of Soc. Sec., 548 F.3d 417, 423 (6th Cir. 2008)).

In the instant case, Terry argues that the ALJ neglected to include his cardiac arrest, DVT, acute PE, and bilateral avascular necrosis of the bilateral hips in the RFC determination. Upon review of the decision, the undersigned finds that the ALJ sufficiently considered each of the aforementioned non-severe

- 24 -

impairments in crafting Terry's RFC. For instance, the ALJ acknowledged that Terry was hospitalized for twenty-two days for cardiac arrest. (R. at 21.) While the ALJ did not go in depth into Terry's medical records from the time he was hospitalized and suffered a cardiac arrest, the ALJ cited to a section of the record where Terry was discharged from the hospital as "quite stable hemodynamically" and where the physician noted that surgery was unnecessary because the incident was "not causing him any physical symptoms." (R. at 662.); see Rice, 2021 WL 1822309, at *7. Terry was subsequently instructed to return to the emergency department if his condition worsened or if he experienced any sort of sudden back/flank pain or bleeding. (R. at 662.) However, when Terry was readmitted to the hospital four days later, the ALJ noted that Terry was treated for DVT and pulmonary edema — not anything associated with his recent cardiac arrest. (R. at 21.) Moreover, since being discharged for a second time in October of 2018, Terry does not identify any functional limitations that stem directly from his cardiac arrest. See Griffeth v. Comm'r of Soc. Sec., 217 F. App'x 425, 429 (6th Cir. 2007) ("A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.") (quoting Yang v. Comm'r of Soc. Sec., No. 00-10446-BC, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004)). The fact that Terry suffered a cardiac

arrest is therefore insufficient to show that the ALJ lacked substantial evidence for his RFC determination.

Similarly, in reciting Terry's medical history, the ALJ observed that an ultrasound in January 2019 found no evidence of DVT. (R. at 21.) This was around the time that Terry's IVC filter (which had been installed to treat his DVT and pulmonary edema during his previous stint in the hospital) was removed. (R. at 650, 755.) While he does not mention PE by name, the ALJ also noted that just months later, in February 2019, an examination showed that Terry's lungs were normal. (R. at 21.) Indeed, the report that the ALJ referred to in making that observation listed both PE and DVT as ailments that were considered "resolved." (R. at 755.) This is in line with Terry's condition before he was hospitalized, when, in April 2018, a radiology report found that, although Terry exhibited low lung volumes, his pulmonary vascularity was normal and, his lungs were clear. (R. at 575.) Additionally, the ALJ included limitations to Terry's exposure to pulmonary irritants in his RFC determination. (R. at 19-20.) As for Terry's alleged bilateral avascular necrosis in his hips, the ALJ pointed out that an MRI showed that Terry suffered from "avascular necrosis of both hips." (R. at 21.) However, the ALJ also noted that "until recently, [Terry] had a normal gait/station" and that Terry's straight leg test results were negative. (R. at 21.) Moreover, in considering whether Terry's severe impairment of dysfunction of a

major joint constituted a major impairment, the ALJ opined that Terry had "neither established that he is unable to ambulate effectively, nor established that he is unable to perform fine and gross movements effectively." (R. at 19.) That the ALJ considered Terry's bilateral necrosis is further evidenced by the fact that his RFC is limited to sedentary work and that he can only be required to stand or walk with assistance from an ambulatory device — i.e. his cane. (R. at 19-20.) Therefore, for each of these alleged impairments, the ALJ's opinion is sufficient to show that he considered (and sometimes included in part) their corresponding limitations in crafting his RFC.

Terry argues in his brief that, cumulatively, these impairments limit him to "less than light work; a significant limitation to be sure." (ECF No. 19 at 13.) The undersigned notes, however, that the ALJ found that Terry could perform sedentary work with several additional limitations, meaning that the ALJ's RFC already limits Terry to less than what social security regulations define as light work.[3] (R. at 19-20.) Beyond reciting

---

[3]Sedentary work is defined as work involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a). Light work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or

the aforementioned impairments, stating that they limit Terry to less than light work, and directing the court to findings by "examining physicians" (presumably Dr. Montgomery), Terry does not articulate how exactly these impairments further limit his residual abilities to work. See Howard, 276 F.3d at 240. Without more, Terry does not satisfy his burden of "proving [his] lack of residual functional capacity." Jordan, 548 F.3d at 423 (citing Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389–90 (6th Cir. 1999)). Thus, Terry's argument that the ALJ's RFC determination is not supported by substantial evidence because of the aforementioned non-severe impairments does not warrant remand. See Mokbel-Aljahmi v. Comm'r of Soc. Sec., 732 F. App'x 395, 400 (6th Cir. 2018) ("[O]n review, it is not for [the court] to decide if there was evidence in favor of [claimant]'s position. [The court] decide[s] only whether there was substantial evidence to support the ALJ's decision. If so, [the court] defer[s] to that decision even in the face of substantial evidence supporting the opposite conclusion." (internal citations omitted)).

---

when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b). "If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Additionally, Terry challenges the ALJ's RFC determination by arguing that it did not account for the vocational expert's testimony in response to the second hypothetical. It is well settled that "[a]n ALJ is not required to rely on 'alternate hypothetical[s] based on [claimant]'s preferred theory of the case.'" Willis v. Comm'r of Soc. Sec., No. 20-cv-1066-TMP, 2021 WL 1687316, at *8 (W.D. Tenn. Apr. 29, 2021) (quoting Blythe v. Berryhill, No. 18-1028-TMP, 2019 WL 4277000, at *10 (W.D. Tenn. Sept. 10, 2019)). The ALJ's second hypothetical was based on Dr. Montgomery's proposed limitations. This court has already found that the ALJ did not err in concluding that Dr. Montgomery's opinion was only partially persuasive. See Blythe, 2019 WL 4277000, at *10 (holding that an ALJ satisfies his or her obligation under social security regulations where he or she "incorporated . . . specific limitations he [or she] ultimately found credible into a hypothetical question" for the vocational expert and for determining the claimant's RFC); Her, 203 F.3d at 389-90 ("Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached."). As such, it was not error for the ALJ to decline to adopt a hypothetical that was based on Dr.

Montgomery's opinion, and this too is not a reason to remand the ALJ's decision.[4]

### III. CONCLUSION

For the reasons above, the Commissioner's decision is supported by substantial evidence and is hereby AFFIRMED.

IT IS SO ORDERED.

/s/ Tu M. Pham
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
TU M. PHAM
Chief United States Magistrate Judge

June 2, 2021
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Date

---

[4]Terry briefly points to several other alleged errors in the ALJ's decision, including that he gave no weight to Terry's testimony and that the ALJ erred by giving significant weight to the opinions of non-examining medical sources. These arguments, however, are raised only in a conclusory manner without any legal argument. As such, they are deemed waived. See Burns v. Saul, No. 1:19-cv-01255-jay, 2020 WL 8116174, at *3 (W.D. Tenn. Sept. 29, 2020) ("[T]he court is under no obligation to scour the record for errors not identified by the claimant, and arguments not raised and supported in more than a perfunctory manner may be deemed waived.") (citing Howington v. Astrue, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) and Woods v. Comm'r of Soc. Sec., No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sept. 29, 2009)).